ART METAL–U. S. A., INC., Plaintiff,

v.

UNITED STATES DEPARTMENT OF COMMERCE, ECONOMIC DEVELOPMENT ADMINISTRATION, et al., Defendants.

Civ. A. No. 81–2234.

United States District Court, District of Columbia.

Nov. 12, 1981.

---

1. Section 408.020 was amended, effective September 29, 1979, to increase the rate of interest to nine per cent (9%) per annum. However, that amendment may be applied prospectively only. *See* Mo.Const.Art. 1, § 13. Because liability here accrued prior to the effective date of the amendment, the lower rate of interest controls.

Herbert L. Fenster, D. Michael Fitzhugh, Thomas C. Papson, Darryl J. Lee, Washington, D. C., for plaintiff.

Charles F. C. Ruff, U. S. Atty., Royce C. Lamberth, Dayton Lehman, Jr., Asst. U. S. Attys., Washington, D. C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

OBERDORFER, District Judge.

This action is before the Court on plaintiff's motion for a preliminary injunction, the Court's jurisdiction being invoked under the Public Works and Economic Development Act, 42 U.S.C. §§ 3121–3226, the Administrative Procedure Act, 5 U.S.C. §§ 701–06, and what plaintiff terms in the complaint "the general powers of this Court as a court of equity." At issue are insurance proceeds paid to defendant Economic Development Administration, an agency of the United States Department of Commerce (hereinafter "EDA") as mortgagee of certain property acquired by plaintiff with EDA's assistance. Plaintiff seeks an order requiring EDA to pay the proceeds collected by EDA to plaintiff, and bases its claim upon an oral agreement allegedly made by EDA's Atlantic Regional Office ("ARO") to pay those proceeds to plaintiff. Because it appears that there is not the likelihood of success on the merits required for issuance of a preliminary injunction, *see Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 182 U.S.App.D.C. 220, 559 F.2d 841 (1977), plaintiff's motion will be denied.

## FINDINGS OF FACT

1. In 1972 Art Metal-U.S.A., Inc. ("Art-Metal"), a New Jersey-based fabricator of office and library equipment, acquired certain property adjacent to its Newark facilities and began construction on an addition to its plant. The construction was financed in part by a loan from EDA to Art-Metal of over $2,000,000.

2. Art-Metal's indebtedness to EDA was secured by a mortgage on the company's real property at the Newark site. Under the terms of the loan agreement and a promissory note executed by Art-Metal and payable to EDA, Art-Metal was to repay its indebtedness over a 25-year period with interest at six percent per annum. The mortgage also required Art-Metal to maintain hazard insurance on the property in which EDA had an interest. EDA was named in the mortgage instrument as mortgage loss payee for the insurance policies Art-Metal was required to maintain. The mortgage thus gave EDA an option to apply any insurance proceeds obtained by it to the company's outstanding indebtedness, or to release the proceeds to Art-Metal to finance repair or replacement of the damaged facilities. Under the insurance policies, some circumstances which might delay or even preclude collection of an insurance payment by Art-Metal as insured (such as suspicion as to the cause of loss) did not necessarily preclude forthwith payment to EDA as mortgagee. *See* Defendants' Memorandum of Points and Authorities in Opposition to Plaintiff's Application for a Preliminary Injunction, Exhibit D, unnumbered page captioned "Uniform Covenants" ¶ 3.

3. On three occasions in the years 1979 and 1980 in which Art-Metal sustained damage at the Newark plant, the carriers paid the proceeds to EDA, whereupon the agency released the proceeds it received to Art-Metal. In those transactions, the insurance carriers in effect paid to Art-Metal via EDA approximately $320,000. *See* Plaintiff's Memorandum of Points and Authorities in Support of Application for a Preliminary Injunction, Affidavit of P. Kurens and

Exhibit 3 thereto. In each instance, the Regional Director of the ARO signed the endorsement on the agency's behalf to release the funds to Art-Metal. The first such payment to Art-Metal occurred on or after Feb. 2, 1979; the second, on or after Nov. 25, 1980; and the third, on or after December 4, 1980. *Id.*

4. On August 23, 1980, a fire damaged a substantial portion of Art-Metal's Newark plant, and the company ceased operation at that location. On an uncertain date, Art-Metal submitted claims to the insurance carriers concerned, and informed EDA of the damage. The firm's aggregate claim and proof of loss totaled $9,451,812; the claims for damage on property in which EDA had an interest as mortgagee amounted to $1,525,898. At the time of the fire, Art-Metal's outstanding indebtedness to EDA was a sum slightly in excess of $2,026,000. At that time, EDA had filed no claims. Payment on Art-Metal's claim was not immediately forthcoming from the insurance carriers.

5. Without first consulting EDA regarding its intentions to seek payment on the insurance policies to EDA as mortgage loss payee, or awaiting payment of its own claims by the insurance carriers, Art-Metal in October or November of 1980 made a decision to reconstruct the facilities and to reopen them. Reconstruction began in November 1980. Art-Metal began to encounter difficulties in obtaining recoveries on its own claims, owing to the carriers' concern that the fire had been caused by arson and that Art-Metal had not cooperated fully in the carriers' investigation of the fire. P. Kurens affidavit ¶ 22.

6. In December 1980, Art-Metal engaged Harold R. Teltser, a member of the New Jersey bar, to encourage EDA to file a claim as loss payee under the mortgage with a view to further persuading EDA to pay over the proceeds so collected to Art-Metal. In February 1981, Teltser spoke by telephone with John A. Geraghty, a financial analyst at the ARO, to alert EDA to its position as mortgage loss payee and to offer assistance to EDA in presenting claims as loss payee to the insurance carriers. In that conversation, in later discussions, and in a letter dated February 25, 1981, Teltser also requested that EDA pay the proceeds it might obtain from the carriers to Art-Metal to finance reconstruction. The letter of February 25, 1981 stated that repairs were proceeding rapidly, and "may well be complete by the time the first funds are received from the insurance carriers." H. Teltser affidavit, Exhibit 1. Teltser had chosen to speak with Geraghty "regarding the insurance proceeds" because he believed "Mr. Geraghty had the authority to deal with such questions." H. Teltser affidavit ¶ 5. The basis of Teltser's belief is not explained by the record evidence, and it is established by the evidence that Teltser had no basis for believing Geraghty to be Regional Director of the ARO.

7. In early April 1981, the Regional Director of the ARO wrote to the insurance carriers' General Adjustment Bureau to request payment on the loss sustained at Art-Metal's plant during the August 1980 fire. Following correspondence between EDA and representatives of the carriers, EDA executed on August 18, 1981, a general release discharging the insurance carriers from liability to EDA, and EDA received from the carriers checks for the sum of $1,525,898 as payment on EDA's claims arising from the August 1980 fire.

8. On August 21, 1981, the ARO recommended to EDA headquarters in Washington that the insurance proceeds from the August fire be applied to reduce the loan balance and that the remaining balance be collected. In telephone conversations and at a meeting on September 14, 1981, the EDA official in Washington with authority to make a final decision as to use of the insurance proceeds and the disposition of the loan to Art-Metal, John J. McCracken, Jr., told Art-Metal's representatives that Art-Metal needed to establish its ability to repay the balance of the loan if EDA was to elect to pay the insurance proceeds to the company.

9. On September 15, 1981, Art-Metal filed this action. Without prejudice to its claim that the agency's representatives at

the ARO had already committed the agency to pay Art-Metal the proceeds it had obtained, plaintiff subsequently submitted more financial data to EDA concerning its ability to repay the balance of the loan.

10. By letter dated October 23, 1981, McCracken informed Art-Metal that EDA had determined that "it would be imprudent, and against the Government's best interests, to release the insurance funds to Art-Metal." McCracken indicated in the letter that the agency's decision was based upon the ARO's recommendation, the meeting of September 14, 1981, the information furnished by Art-Metal, and on "EDA's independent analysis and investigation." Memorandum in Support of Plaintiff's Motion for Reconsideration of the Court's Order Limiting Discovery, Exhibit 1. The letter recited what McCracken considered "downward trends" in Art-Metal's business, the firm's "existing non-operating status," assertedly "unrealistic" sales projections, "the threat of possible foreclosure by the insurance companies should they prevail in their litigation" with Art-Metal respecting liability on various policies, as well as other factors. The letter noted that even after application of the insurance proceeds to the mortgage, a deficiency in the company's payments would still exist, and it urged Art-Metal to bring its mortgage account with EDA to current status.

11. There exists a dispute between the parties as to whether officials in the ARO orally agreed to pay the insurance proceeds to Art-Metal for the financing of plant reconstruction. The EDA official to whom plaintiff attributes such an undertaking, Geraghty, denies it in an affidavit, and plaintiff has offered no written evidence of such a commitment. The only EDA document evidencing a decision on the company's request for proceeds is the letter of October 23, 1981, written by McCracken, in which the agency announced that it had rejected that request.

## CONCLUSIONS OF LAW

### A.

1. The Public Works and Economic Development Act, *supra*, confers jurisdiction on United States district courts to adjudicate claims against EDA based upon the Act, but limits authority to grant equitable relief in the following terms:

> [The Secretary of Commerce may] sue and be sued in any court of record of a State having general jurisdiction or in any United States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy; but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Secretary or his property. . . .

42 U.S.C. § 3211(11). That provision presents a formidable obstacle to plaintiff's application for injunctive relief against EDA. Plaintiff attempts to argue that because the agency's action was clearly beyond the scope of its authority, plaintiff is entitled to relief notwithstanding Congress' express withdrawal of jurisdiction to enjoin the Secretary in connection with his work under this Act. To support such an exception from the no-injunction provision, plaintiff cites cases like *Valley Forge Flag Co. v. Kleppe*, 165 U.S.App.D.C. 182, 183, 506 F.2d 243, 244 (1974) (per curiam). There the Court of Appeals denied an injunction against the Small Business Administration ("SBA") because the SBA was immune from injunction under a statutory provision identical to 42 U.S.C. § 3211(11). The Court of Appeals based its decision upon a finding that the administrator had acted "within the scope of his authority." *Id.*, 506 F.2d at 244. Plaintiff suggests that in light of the subsequent statement by our Court of Appeals in *Oklahoma Aerotronics v. United States*, 661 F.2d 976 (1981), in which it indicated that equitable relief could be obtained against the SBA for an egregious violation of the Administrative Procedure Act, this Court has jurisdiction to redress action by EDA beyond the scope of its authority. But the *Oklahoma Aerotronics* court granted no relief to the plaintiff there and its decision is not solid authority for the plaintiff's position here. *See also Mar v.*

*Kleppe*, 520 F.2d 867, 869 (10th Cir. 1975) ("As we read the [SBA] statute it consents to a suit against the Administrator, but also contains a proviso that an injunction together with other writs cannot issue.")

The Court has found no decisions construing the no-injunction provision of the Public Works and Economic Development Act. Granting plaintiff's theory that action beyond the scope of authority is not immune from injunction, however, plaintiff has not demonstrated that the agency's action in this case was so far beyond the statutory authority as to justify an injunction. If the exercise of EDA's discretion under the mortgage instrument to apply insurance proceeds either to the borrower's indebtedness or to reconstruction of the mortgaged facility is subject to injunction, then little might remain of 42 U.S.C. § 3211(11).

### B.

Even if the Court of Appeals' dictum in *Valley Forge Flag* and *Oklahoma Aerotronics* were applicable here and this Court had any jurisdiction, plaintiff would not, under the test of *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, supra,* be entitled to a preliminary injunction because it has not demonstrated the likelihood of success on the merits necessary for the extraordinary remedy it seeks.[1] Under each of its theories for relief, plaintiff's argument assumes that it is entitled to a remedy even though Geraghty lacked actual authority to make the election permitted by the mortgage instrument to pay insurance proceeds to Art-Metal. It is improbable that plaintiff will show, in the absence of a written commitment by Geraghty or any other EDA official to pay the proceeds to Art-Metal, that this Court could enforce by injunction any obligation against the agency based upon Geraghty's alleged promise. Indeed, the Supreme Court has only last Term reminded the beneficiaries of public assistance that federal government agencies are not bound for any purpose by erroneous information or assertions of authority by government officials. *See Schweiker v. Hansen*, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981). Our Court of Appeals in *Molton, Allen & Williams v. Harris*, 198 U.S.App.D.C. 443, 613 F.2d 1176 (1981) was unwavering in its support of the rule in *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947) that agents who lack actual authority cannot make commitments on the government's behalf. *See* 198 U.S.App.D.C. at 446 n.11, 613 F.2d at 1179 n. 11. For that reason, it is unnecessary to resolve, at this time, the factual dispute about Geraghty's alleged oral commitment to grant Art-Metal the insurance proceeds: as a matter of law, such a commitment is unlikely to be effective in establishing an obligation that the judicial branch of the federal government could enforce against the executive branch.

Plaintiff alternately suggests something in the nature of a reliance theory: that it was entitled to assume that, with the passage of time, and as it received other insurance proceeds from EDA, the agency would pay the $1.5 million recovery it sought to finance reconstruction. This argument is difficult to support on the facts established in plaintiff's own affidavits, which effectively contradict any such claim of detrimental reliance. The decision to reopen the facilities at Newark, which required dangerous depletion of the firm's capital, was taken before the firm received the latter two checks from EDA noted in Finding of Fact 3, *supra*. Probably not even a private party, and surely not the government, would be chargeable upon a $1.5 million obligation on account of having paid a far smaller sum, under very different circumstances, to the "relying" party. *See Federal Crop Ins. Corp. v. Merrill, supra*. The chronology of events—the decision to re-

---

1. Consideration of the application for preliminary injunction on an assumption that jurisdiction does exist appears to have been contemplated by the panel in *Valley Forge Flag*, which rejected the application for a preliminary injunction both because there was no jurisdiction to grant such relief and because the applicant had not met the test for a preliminary injunction associated with the *Virginia Petroleum Jobbers* decision. *See* 165 U.S.App.D.C. at 183, 506 F.2d at 244.

open the plant, Art-Metal's difficulties with the insurance carriers, the engagement of Teltser, and the increasing pressure on EDA—establish that, plaintiff is most unlikely to prove reliance. A plenary hearing will most probably show that even if there were any "reliance" by Art-Metal, it was grossly and erroneously misplaced.

Finally, plaintiff suggests that it could assume that because Teltser's requests for payment of the proceeds were not rejected in writing, it was entitled to assume that they had been accepted, either by Geraghty or by the EDA as an entity. This theory that silence could somehow mean consent, if it were to have persuasive force in an ordinary commercial setting, would need to be based upon a course of dealing or usage that plaintiff has not even attempted to show. And here as well, the object of estoppel is no ordinary business, but a federal agency. *See Federal Crop Ins. Corp. v. Merrill, supra.* It is equally unlikely therefore that plaintiff will prevail on the merits of this contention.

Only if it appears that the other factors outlined in *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, supra,* strongly weigh in plaintiff's favor may the Court overcome a plaintiff's failure to demonstrate likelihood of success on the merits and enter a preliminary injunction. 182 U.S.App.D.C. at 223, 559 F.2d at 844. It may be that, in some instances, proof that a business could be saved from destruction by the grant of a preliminary injunction might warrant such extraordinary relief. 182 U.S.App.D.C. at 222, 559 F.2d at 543. But the suggestion in plaintiff's affidavits that non-payment of the proceeds would require liquidation of assets are imprecise and evasive, and do not overcome the probable defects in plaintiff's case on the merits. Nor is Art-Metal's claim strengthened by its decision to rebuild the Newark plant without prior consultation with EDA. That unilateral decision may not only explain the firm's present difficulties, but will probably weigh heavily against plaintiff's various theories of estoppel and reliance in any decision on the ultimate merits. *See* Finding of Fact 5, *supra.*

There are, moreover, two reasons to believe that the public interest would be ill-served by a preliminary injunction. The McCracken letter of October 23, 1981, embodied a finding that payment of the proceeds to Art-Metal would not serve the public interest. The Court has no basis for rejecting that determination now as either clearly erroneous or in bad faith. It is also apparent that Congress' prohibition of ordinary equitable relief in 42 U.S.C. § 3211(11) evidences a policy decision that such relief is generally not in the public interest. There is thus no occasion for this Court to enter an injunction pending trial on the merits, here or in the Court of Claims.

An accompanying order therefore denies plaintiff's motion for a preliminary injunction.