UNITED ASSOCIATION OF JOURNEY-MEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY, AFL–CIO; and United Brotherhood of Carpenters and Joiners of America, AFL–CIO, Plaintiffs,

v.

Richard L. THORNBURGH, Attorney General; Immigration and Naturalization Service; James P. Baker, III, Secretary of State; Samuel K. Skinner, Secretary of Transportation; and United States Coast Guard, Defendants.

Civ. A. No. 90–2342.

United States District Court,
District of Columbia.

Aug. 7, 1991.

Stephen P. Berzon, Robert C. Bell, Jr., Altschuler, Berzon, Nussbaum, Berzon & Rubin, San Francisco, Cal., Brian Powers, O'Donoghue & O'Donoghue, Kathy L. Krieger, United Broth. of Carpenters and

Joiners, Washington, D.C., Victor Van Bourg, Van Bourg, Weinberg, Roger & Rosenfeld, San Francisco, Cal., for plaintiffs.

Sally M. Rider, John D. Bates, Asst. U.S. Attys., Jay B. Stephens, U.S. Atty., Rachel A. McCarthy, I.N.S., Michael D. Russell, Coast Guard, Washington, D.C., for defendants.

## MEMORANDUM OPINION

FLANNERY, District Judge.

Plaintiffs, two labor unions representing American construction workers, bring this action challenging certain practices of the defendant executive branch officials and agencies involving employment of nonimmigrant aliens to perform construction work on oil rigs located on the United States' Outer Continental Shelf ("OCS.") At issue is which set of statutes and regulations governs the challenged practices. Plaintiffs contend that the employment of nonimmigrant aliens is subject to the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, and its accompanying regulations, which allow work to be performed by nonimmigrant aliens only when no American workers are available and when the wages and working conditions of American workers will not be adversely affected. Defendants argue that the 1978 amendments to the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 *et seq.*, contain provisions pertaining to the employment of nonimmigrant aliens that preclude application of the INA on the OCS. As discussed below, the Court finds that the INA applies to the employment of nonimmigrant construction workers on oil rigs located on the OCS.

### I. *Statutory and Regulatory Background*

#### A. The Immigration and Nationality Act

The INA defines an "alien" as "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). Aliens are divided into two groups: "immigrants" and "nonimmigrants." For purposes of this litigation, an immigrant may be defined as an alien entering the United States with the intention of establishing permanent residence. *See id.* § 1101(a)(15). The INA specifies several categories of aliens who shall be considered nonimmigrants, including "an alien having residence in a foreign country which he has no intention of abandoning ... who is coming temporarily to the United States ... to perform ... temporary service or labor ..." *Id.* § 1101(a)(15)(H)(ii)(b). The latter category of aliens may be admitted to the United States only "if unemployed persons capable of performing such service or labor cannot be found in this country, ..." *Id.*

Immigration and Naturalization Service ("INS") regulations provide that nonimmigrants entering the United States pursuant to § 1101(a)(15)(H)(ii)(b) of the INA are granted "H–2B" visas. 8 C.F.R. § 214.2(h)(1), (h)(1)(ii)(B)(*2*) (1991). An H–2B visa may be issued only upon

> (*1*) A certification from the Secretary of Labor stating that qualified workers in the United States are not available and that the alien's employment will not adversely affect wages and working conditions of similarly employed United States workers; or

> (*2*) A notice detailing the reasons why such certification cannot be made. Such notice shall address the availability of U.S. workers in the occupation and the prevailing wages and working conditions of U.S. workers in the occupation.

*Id.* § 214.2(h)(6)(iv) (1991).[1]

#### B. The Outer Continental Shelf Lands Act

Congress enacted the OCSLA in 1953 in order "to assert the exclusive jurisdiction and control of the Federal Government of the United States over the seabed and sub-

---

1. In their pleadings, the unions cite to the 1990 version of the certification requirement, found at 8 C.F.R. § 214.2(h)(4) (1990). This version is substantively the same as the 1991 certification requirement, although the 1991 regulation has been renumbered and contains slightly different language. Because the unions seek prospective injunctive relief, it is proper to consider the 1991 version of the regulation rather than the version in effect at the time this lawsuit was filed. Because the 1990 and 1991 certification requirements are substantively identical, this action is not rendered moot by the amendment and reissuance of the INS regulations.

soil of the outer Continental Shelf, and to provide for the development of its vast mineral resources." S.Rep. No. 411, 83d Cong., 1st Sess. 2 (1953).[2] Section 1333(a)(1) of the OCSLA provides:

> The Constitution and laws and civil and political jurisdiction of the United States are hereby extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and to all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State ...

43 U.S.C. § 1333(a)(1).[3]

In 1978, Congress amended the OCSLA by adding § 1356(a)(3) and (c). Outer Continental Shelf Lands Act Amendments of 1978, Pub.L. No. 95–372, § 208, 92 Stat. 629, 669–70. This section, applicable to the OCS, provides:

### (a) Regulations

Within six months after September 18, 1978, the Secretary of the Department in which the Coast Guard is operating shall issue regulations which require that any vessel, rig, platform, or other vehicle or structure—

\* \* \* \* \* \*

(3) ... be manned or crewed, except as provided in subsection (c) of this section, by citizens of the United States or aliens lawfully admitted to the United States for permanent residence.

\* \* \* \* \* \*

### (c) Exceptions from manning requirements

The regulations issued under subsection (a)(3) of this section shall not apply—

(1) to any vessel, rig, platform, or other vehicle or structure if—

(A) specific contractual provisions or national registry manning requirements provide to the contrary;

(B) there are not a sufficient number of citizens of the United States or aliens lawfully admitted to the United States for permanent residence, qualified and available for such work; or

(C) the President makes a specific finding, with respect to the particular vessel, rig, platform, or other vehicle or structure, that application would not be consistent with the national interest; and

(2) to any vessel, rig, platform, or other vehicle or structure, over 50 percent of which is owned by citizens of a foreign nation or with respect to which the citizens of a foreign nation have the right effectively to control, except to the extent and to the degree that the President determines that the government of such foreign nation or any of its political subdivisions has implemented, by statute, regulation, policy, or practice, a national manning requirement for equipment engaged in the exploration, development, or production of oil and gas in its offshore areas.

43 U.S.C. § 1356(a)(3), (c).

### II. *Factual Background*

Defendants are various executive branch officials and agencies (hereinafter "the

---

**2.** The Outer Continental Shelf is defined as "all submerged lands lying seaward and outside" the three-mile area extending from the United States coastline. 43 U.S.C. §§ 1301(a)(2), 1331(a).

**3.** In 1978, Congress enacted certain amendments to § 4(a)(1) of the OCSLA of 1953, *codified at* 43 U.S.C. § 1333(a)(1), intended to make clear that Federal law is to be applicable to all activities on all devices in contact with the seabed for exploration, development, and production.... [including] activities on drilling ships, semisubmersible drilling rigs, and other watercraft, when they are connected to the seabed by drillstrings, pipes, or other appurten[an]ces, on the OCS for exploration, development, or production purposes. H.R.Rep. No. 95–590, 95th Cong., 2d Sess. 128 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 1450, 1534.

government") charged with administering the INA and the OCSLA. The unions have identified two oil rig construction projects located on the OCS in which they allege that the government has allowed employment of nonimmigrants in violation of the INA. These oil platforms—the Heritage and Harmony platforms located off the coast of Santa Barbara, California—are being constructed by Heerema Marine Contractors S.A., a Dutch-owned company.

The unions allege that the government has issued nonimmigrant construction workers "B-1" visas,[4] which, unlike H-2B visas, do not require a certification from the Secretary of Labor regarding the unavailability of American workers or the effect of nonimmigrant labor on American wages and working conditions.[5] The government admits that nonimmigrants who present themselves for admission at a United States Port of Entry must possess a visa in order to enter the United States prior to proceeding to the OCS. The government also admits that these nonimmigrants are issued B-1 visas, but it contends that such visas are required solely for the purpose of entering the United States and not for the purpose of performing work on the OCS. The government claims that no visa of any type need be issued if the nonimmigrant proceeds directly to the OCS work site without first entering the mainland United States.

## III. *Discussion*

This case is not the first attempt to reconcile the visa requirements of the INA with § 1356 of the OCSLA. In 1982, the Ninth Circuit considered the relationship between these two statutes in *Piledrivers' Local Union No. 2375 v. Smith*, 695 F.2d 390 (9th Cir.1982). In *Piledrivers'*, the Circuit considered whether the visa requirements of the INA applied to nonimmigrant workers employed as crew members on foreign-owned heavy lift crane ships used in constructing offshore drilling and production platforms. *Id.* at 391. The Court began its analysis by noting that Congress, in enacting the OCSLA in 1953, intended that the INA apply to employment of aliens on the OCS. *Id.* at 393 (quoting S.Rep. No. 411, 83d Cong., 1st Sess. 24 (1953)). The Court also found that Congress intended the 1978 amendments to "restate and clarify and not change existing law." *Id.* (quoting H.R.Conf.Rep. No. 1474, 95th Cong., 2d Sess. 80 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 1450, 1674, 1679). Having found that Congress in 1978 did not intend to repeal application of the INA to the OCS, and "see[ing] no irreconcilable conflict between section 1356 and the I.N.A.," the Ninth Circuit ruled that "the I.N.A. applies to the outer continental shelf except as modified by 43 U.S.C. § 1356." *Id.*

Turning to the facts of the case before it, the *Piledrivers'* Court found that employment of nonimmigrants on the foreign-owned crane ship Challenger I fell within the "foreign ownership exception" of § 1356(c)(2) of the OCSLA. 695 F.2d at 394. The Court's entire discussion of this holding is as follows:

> Challenger I is owned by foreign citizens. We, therefore, hold that the for-

---

**4.** B-1 visas are issued to nonimmigrants entering the United States "temporarily for business or temporarily for pleasure." 8 U.S.C. § 1101(a)(15)(B). B-1 visas are not available to nonimmigrants entering the United States to perform temporary "skilled or unskilled labor," *id.*, or "to perform building or construction work." 8 C.F.R. § 214.2(b)(5) (1991).

**5.** The unions rely upon published INS Operating Instructions in arguing that the government has a practice or policy of issuing B-1 visas to nonimmigrants destined for the OCS. Operations Instruction 214.2(b) provides that

> Persons engaged in activities on the *outer continental shelf* are under the jurisdiction of the United States Coast Guard. Any person

inquiring about his or her right to engage in employment on the outer continental shelf should be referred to the Coast Guard. Nonimmigrants destined to the outer continental shelf normally will be classified B-1, and the consular officers will annotate such visas "OCS[.]"

INS Operations Instruction 214.2(b); *see also* INS Operations Instruction 235.1 (same).

The INS operations Instructions do not specify which classes of nonimmigrants are to be issued B-1 visas. To the extent that these Operations Instructions are relevant to the Court's decision, the Court must assume that they express a policy of issuing B-1 visas to all nonimmigrants destined for employment on the OCS.

eign ownership exception is applicable here, and that the crew of Challenger I is exempt from the certification requirements of the I.N.A.

*Id.*

Neither party urges the Court to adopt the decision in *Piledrivers'*, and, in any event, the Court does not find *Piledrivers'* to be binding or persuasive precedent on the issue raised by this litigation. In addition to the brevity of the Circuit's reasoning, which provides little guidance on this difficult issue of statutory interpretation, the Court finds that *Piledrivers'* ignores the plain language of § 1356. By its very terms, § 1356(c) sets forth exceptions to *"[t]he regulations issued under subsection (a)(3) of this section ..."* 43 U.S.C. § 1356(c) (emphasis added). Nowhere does § 1356(c) purport to create exceptions to application of the INA, as held by the *Piledrivers'* Court. Courts are obligated to give effect to the plain and unambiguous meaning of a statute, and exceptions to clearly delineated statutes will be implied only when the plain language would give rise to absurd results or to consequences obviously at odds with the underlying statutory scheme. *United States v. Rutherford*, 442 U.S. 544, 551–52, 99 S.Ct. 2470, 2474–75, 61 L.Ed.2d 68 (1979) (citing cases). The *Piledrivers'* Court not only ignored the plain language of § 1356(c), which expressly limits application of its exceptions to the Coast Guard regulations promulgated pursuant to § 1356(a)(3), but it also read § 1356(c) to imply an exception to a wholly independent statute, the INA, without providing any legal support or detailed discussion of its rationale for deciding upon such an unusual statutory construction. Thus, the Court declines to follow *Piledrivers'*.

Reconciliation of the provisions of the INA and the OCSLA was also attempted by the Office of Legal Counsel ("OLC") shortly after passage of the 1978 OCSLA amendments. *See* Memorandum Opinion for the General Counsel, Immigration and Naturalization Service, No. 79–68, 3 Op.Off.Legal Counsel 362 (1979). Upon reviewing the statutory language and legislative history, the OLC concluded that § 1333(a)(1) of the OCSLA, "standing alone, is broad enough to require application of the Immigration and Naturalization Act to drilling rigs on the Shelf." *Id.* at 365. Upon consideration of the effect of § 1356's specific language, however, the OLC found that "[t]he only conclusion that makes sense ... is to assume that § [1356] is intended to be a self-contained statement of the extent to which principles of immigration control are to be applied." *Id.* at 366.

The OLC gave two reasons for its conclusion that § 1356 displaces the INA. First, the OLC found that the immigration laws do not include the authority to create exceptions parallel to those of § 1356, "and [that] the 1978 amendments do not purport to modify the Immigration and Naturalization Act." 3 Op. Office Legal Counsel at 366. Second, the OLC raised the pragmatic concern that giving effect to both statutes on the OCS would have the undesirable effect of vesting jurisdiction to enforce similar statutory provisions in two agencies, the INS and the Coast Guard. *Id.* n. 7. The OLC believed that this would result in inconsistent application of the laws and duplication of agency efforts. *Id.*

■ The Court disagrees with the OLC's conclusion that § 1356 of OCSLA precludes application of the INA on the OCS. It is a "'cardinal rule'" of statutory interpretation "'that repeals by implication are not favored.'" *Morton v. Mancari*, 417 U.S. 535, 549, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974) (quoting *Posadas v. National City Bank*, 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936)). The intention of the legislature to repeal the earlier statute must be clear and manifest. *Tennessee Valley Auth'y v. Hill*, 437 U.S. 153, 189–90, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1979) (citing cases). "[R]epeals [by implication] are strongly disfavored on the ground that Congress is normally expected to be aware of its previous enactments and to provide a clear statement of repeal ..." *Samuels v. District of Columbia*, 770 F.2d 184, 195 (D.C.Cir.1985).

An intent to repeal an earlier statute may be found in one of two ways. The

Court first must look for some indication of an intent to repeal in the statutory language and in the legislative history of the statute. *See Morton,* 417 U.S. at 550, 94 S.Ct. at 2482. "In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Id.* (citing *Georgia v. Pennsylvania R. Co.,* 324 U.S. 439, 456–57, 65 S.Ct. 716, 725–26, 89 L.Ed. 1051 (1945)).

■■■ The language of the OCSLA reveals no express intent to repeal the INA.[6] Likewise, the legislative history of the OCSLA contains no indication of a congressional intent to preclude application of the INA on the OCS. Certainly in 1953 Congress believed that the INA should apply to the OCS. *See* 3 Op.Off.Legal Counsel at 364–65. Prior to passage of the original OCSLA, Congress deleted from the Senate bill specific language dealing with the employment of aliens, explaining that "since all applicable Federal laws are extended to the seabed and subsoil of the outer shelf [by § 1333(a)(1) ], the specific provisions respecting aliens are believed unnecessary." S.Rep. No. 411, 83d Cong., 1st Sess. 24 (1953).

When Congress amended § 1333(a)(1) of the OCSLA in 1978, it noted that the changes were merely technical in nature, intended to clarify the applicability of federal law to oil production facilities located on the OCS, and that the amendments were "meant to restate and clarify and not change existing law. Under the conference report language, Federal law is to be applicable to all activities on all devices in contact with the seabed for exploration, development, and production." H.R.Conf.Rep. No. 1474, 95th Cong., 2d Sess. 80 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 1674, 1679; *see also* H.R.Rep. No. 590, 9th Cong., 2d Sess. 128, *reprinted in* 1978 U.S.Code Cong. & Admin.News at 1534. Thus, the Court finds that Congress in 1953 intended that the INA be applicable

to the OCS, and that Congress in the 1978 amendments to the OCSLA did not clearly express an intention to repeal application of the INA on the OCS.

Absent an express indication of congressional intent to repeal the INA, "the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Morton,* 417 U.S. at 550, 94 S.Ct. at 2482 (citation omitted). The Court does not find the INA and the OCSLA to be irreconcilable as applied to the facts of this case. Section 1356(a)(3) directs the Coast Guard to issue regulations requiring that, subject to the exceptions set forth in subsection (c), oil production facilities be "manned or crewed" by United States citizens or immigrants. 43 U.S.C. § 1356(a)(3). Unfortunately, the OCSLA does not define the phrase "manned or crewed." The Court finds that the meaning of this phrase is determined by reference to two non-statutory sources.

In the legislative history to the 1978 amendments, Congress indicated that "[t]he provision as to use of citizens and permanent resident aliens applies only to 'manning' or 'crewing.' Thus, specialists, professionals, or other technically trained personnel called in to handle emergencies *or other temporary operations* would not be included." H.R.Conf.Rep. No. 1474, 95th Cong., 2d Sess. 125, *reprinted in* 1978 U.S.Code Cong. & Admin.News at 1724 (emphasis added); *see also* H.R.Rep. No. 590, 95th Cong., 2d Sess. 177, *reprinted in* 1978 U.S.Code Cong. & Admin.News at 1582 ("specialist called in to handle an emergency situation would not be included" in " 'manning' or 'crewing' " provision of § 1356(a)(3)).

The meaning of OCSLA's manning or crewing requirement may be further discerned by reference to the Coast Guard regulations promulgated pursuant to § 1356(a). *See* 33 C.F.R. §§ 141.1–.35 (1990). These regulations, which mirror the statutory restrictions on employment of

---

**6.** Quite to the contrary, the plain language of the OCSLA indicates an intention to make all federal laws applicable to the OCS. *See* 43 U.S.C. § 1333(a)(1); *see also id.* § 1333(f) ("The

specific application by this section of certain provisions of law to the [OCS] ... shall not give rise to any inference that the application ... of any other provision of law is not intended.").

nonimmigrants contained in § 1356, provide that

(a) On or after April 5, 1983, each employer of personnel on any unit engaged in OCS activity that is subject to this part must employ, as members of the regular complement of the unit, only citizens of the United States or resident aliens except as provided by § 141.20.

(b) As used in paragraph (a) of this section, "regular complement of a unit" means those personnel necessary for the routine functioning of the unit ... The term does not include specialists, professionals, or other technically trained personnel called in to handle emergencies or other temporary operations; extra personnel on a unit for training; *and other personnel temporarily on a unit for specialized operations, such as construction,* alteration, well logging, or unusual repairs or emergencies.

*Id.* § 141.15 (emphasis added).[7]

Based upon the legislative history of § 1356 and the regulations promulgated pursuant to that section, the Court finds that temporary construction workers are not employees necessary for the routine functioning of an oil production facility, and, thus, that temporary construction workers are not encompassed by the manning and crewing requirement of § 1356(a)(3). Because § 1356 does not purport to apply immigration restrictions to the types of nonimmigrant employees subject to this litigation, the Court finds that, on the facts of this case, there is no conflict between § 1356 of the OCSLA and the general immigration provisions of the INA. Because the INA and the OCSLA are not irreconcilable, there can be no finding by the Court that the OCSLA repeals by implication the INA. *See Morton,* 417 U.S. at 550, 94 S.Ct. at 2482. The Court having found that the 1978 OCSLA amendments

did not effect a general repeal of application of the INA to the OCS, and the Court now finding that § 1356(a)(3) does not repeal by implication application of the INA to nonimmigrant construction workers on the OCS, the Court concludes that the INA applies to these workers and that the government must comply with the relevant visa provisions of the INA.[8]

### IV. *Conclusion*

For the foregoing reasons, the Court finds that the employment of nonimmigrant construction workers on the OCS is subject to the requirements of the INA. The Court declares the government's practice of allowing nonimmigrants to perform such work on the INA without complying with the relevant provisions of the INA and its accompanying regulations to be illegal. The Court enjoins the government from continuing these illegal practices in the future, and the Court further directs the government to immediately undertake steps to ensure compliance with the visa requirements of the INA and relevant administrative regulations. An appropriate Order accompanies this Memorandum Opinion.

### ORDER

For the reasons set forth in the accompanying Memorandum Opinion, it is by the Court this 6th day of August 1991

ORDERED that plaintiffs' motion for summary judgment be, and it hereby is, GRANTED in accordance with this Order and the accompanying Memorandum Opinion; and it is further

ORDERED that defendants' motion to dismiss or for summary judgment be, and it hereby is, DENIED; and it is further

DECLARED that defendants Richard L. Thornburgh, the Immigration and Naturalization Service, James A. Baker III, Samuel

---

**7.** The Coast Guard regulations also provide for exceptions to the employment restrictions of 33 C.F.R. § 141.15(a) which are substantially the same as the exceptions to the manning or crewing requirement found in 43 U.S.C. § 1356(c). *See* 33 C.F.R. § 141.20.

**8.** The Court's finding is limited to the facts of this case. The Court does not decide whether

the 1978 amendments to the OCSLA modify or repeal the INA as applied to the employment of workers other than those hired to perform temporary construction work on the OCS. Specifically, the Court does not decide whether the OCSLA repeals application of the INA to employees who are encompassed by the manning and crewing requirement of § 1356(a)(3).

K. Skinner, and the United States Coast Guard have violated Sections 101(a)(15)(B) and 101(a)(15)(H)(ii) of the Immigration and Nationality Act, 8 U.S.C. §§ 1101(a)(15)(B) and 1101(a)(15)(H)(ii), and the regulations promulgated thereunder, 8 C.F.R. § 214.-2(h)(6)(iv) (1991), by permitting nonimmigrant aliens to perform construction work or other similar skilled or unskilled labor of a temporary nature on the United States Outer Continental Shelf without complying with the Labor Department certification procedures in 8 C.F.R. § 214.2(h)(6)(iv) (1991); and it is further

ORDERED that the defendants, their successors, employees, agents and assigns, and all persons acting in concert with them, be, and they hereby are, ENJOINED to:

(a) cease enforcing or giving effect to any and all rules, regulations, policies, and practices pursuant to which nonimmigrant aliens are permitted to perform construction work or other similar skilled or unskilled labor of a temporary nature on the United States Outer Continental Shelf without the labor certification procedures required by 8 C.F.R. § 214.-2(h)(6)(iv) (1991);

(b) determine or redetermine the proper visa classifications, if any, of all nonimmigrant aliens who are currently engaged in construction work or other similar skilled or unskilled labor of a temporary nature on the United States Outer Continental Shelf and who have not previously been issued visas in accordance with the labor certification procedures required by 8 C.F.R. § 214.2(h)(6)(iv) (1991);

(c) comply with Sections 101(a)(15)(B) and 101(a)(15)(H)(ii) of the Immigration and Nationality Act, 8 U.S.C. §§ 1101(a)(15)(B) and 1101(a)(15)(H)(ii), and 8 C.F.R. § 214.2(h)(6)(iv) (1991) in future determinations of the proper visa classifications of nonimmigrant aliens admitted. to the United States for purposes of performing construction work or other similar skilled or unskilled labor of a temporary nature.